**UNITED STATES of America, Appellee,**

v.

**Dennis LEONARDI and Steven Jay Berland, Defendants-Appellants.**

**Nos. 259, 260, Dockets 79–1214, 79–1224.**

United States Court of Appeals, Second Circuit.

Argued Nov. 2, 1979.

Decided April 17, 1980.

Irving Cohen, New York City (Geller & Cohen, New York City, of counsel), for appellant Leonardi.

* Honorable John F. Dooling, Jr., United States District Judge for the Eastern District of New

Barry A. Bohrer, New York City (Bohrer, Ullman & Taikeff, New York City, of counsel), for appellant Berland.

Robert S. Litt, Asst. U. S. Atty., S. D. N. Y. (Robert B. Fiske, Jr., U. S. Atty., Scott W. Muller, David C. Patterson, Asst. U. S. Attys., S. D. N. Y., of counsel), for the U. S.

Before MESKILL and KEARSE, Circuit Judges, and DOOLING, District Judge.*

MESKILL, Circuit Judge:

Dennis Leonardi and Steven Jay Berland appeal from judgments of conviction entered in the United States District Court for the Southern District of New York after trial before Hon. Charles H. Tenney and a jury. Berland was found guilty of conspiracy and armed robbery of two federally insured banks in violation of 18 U.S.C. §§ 371 and 2113(a) and (d). Leonardi was convicted of having received a portion of the proceeds of the first of these robberies, in violation of 18 U.S.C. § 2113(c). On this appeal, Berland attacks the admission of the testimony of one Samuel Ax, an unindicted co-conspirator and accomplice in both robberies, on the ground that his cooperation was obtained through the exploitation of an illegal search, and further claims that a witness' in-court identification of him was induced by an improperly suggestive pretrial photographic spread. Leonardi claims that his defense was irreparably prejudiced by various restraints placed by the trial judge upon his cross-examination of Ax. Finding these assertions to be without merit, we affirm the judgments of conviction.

I.

The jury could have determined, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), that in late July, 1978, Berland and Ax, acquaintances for approximately five years, entered into a conspiracy to rob an as yet unspecified Westchester bank. Pursuant to their scheme, Ax stole an automobile, and after

York, sitting by designation.

reconnoitering the Bronxville area, the duo selected the First Federal Savings and Loan Association as their target. In aid of their venture, they purchased two handguns from Dennis Leonardi, then a guest in the motel at which Berland was staying, for an agreed price of $1,500, payment to be deferred, in Ax's paraphrase of Berland's words, until "after he [Berland] did something."

Shortly thereafter on the afternoon of August 16, 1978, Berland and Ax staged the armed robbery of the Bronxville bank. After parking their stolen vehicle nearby, the pair drew ski masks over their faces as they entered the bank, announced their intentions, and with Berland pointing a .30 caliber carbine at patrons and employees, Ax vaulted the counter and proceeded to fill a pillowcase with approximately $31,000 in cash. As the pair ran from the scene of the crime, they removed their masks and fled down the street towards the getaway car. Their actions attracted the attention of Joseph Valesey, who had just stopped his car at a traffic light located near the bank. Valesey's suspicions were confirmed when Berland ran headlong into a truck also stopped in traffic, causing him to drop the jacket he had been carrying, thereby revealing the carbine. Focusing on Berland, Valesey "observed with as much accuracy as [he] could what he [Berland] looked like," getting a "good look" at his face. The evidence indicates that Valesey's vantage point was unobstructed, that the robbers passed close by his car and that he was able to view their flight for about twenty seconds.

As the pair reached their car, Valesey decided to give chase, and for a brief period he trailed directly behind them. Warned by Ax that they were being followed, Berland swiveled around in his seat, affording the witness, for approximately five seconds, another full view of his face. The getaway car accelerated rapidly and the robbers succeeded in eluding Valesey who promptly reported his observations to the Bronxville Police Department, describing Berland with particularity and aiding in the creation of a composite sketch of that suspect's face.

Upon reaching Berland's motel, the robbers entered Leonardi's room where they divided their loot. They were joined shortly thereafter by Leonardi who was treated to a detailed recounting of the heist and was paid from the proceeds of the robbery for the handguns that he had supplied.

The evidence further supports the charge that in mid-September, 1978, at the suggestion of one Frank Sicoli, Berland and Ax robbed the Westchester Federal Savings and Loan Association, located in New Rochelle. Virtually the same modus operandi was utilized, and again, a mishap occurred as the robbers fled from the scene: their departure was noticed by an off-duty security guard standing in a garage across the street from the bank and gunfire was exchanged. A bullet fired by Berland was later recovered by the police, and subsequent ballistics tests indicated that it had been discharged from one of the handguns provided by Leonardi. The robbers crashed their car into the rear of a parked truck before effecting their escape. Another eyewitness subsequently observed them as they abandoned the damaged getaway car in favor of Berland's own automobile.

Attempts to discover the identities of the two robbers during the fall of 1978 were fruitless. On three occasions Valesey was shown photographic arrays, none of which contained Berland's picture, and appropriately, the witness did not recognize any of the persons pictured as the man he had seen in August. In early December Leonardi, for reasons which remain obscure, confided to an acquaintance who was a New York City police officer that Berland and Ax had perpetrated the Bronxville robbery, indicated their last-known address, and admitted selling them a handgun. This information was relayed to the Bronxville police. As a result, a photograph of Berland was included in a fourth photographic spread shown to Valesey late in the evening of December 5, 1978, by Detective Milite of the Bronxville police. It is not certain whether this took place at Lawrence Hospital, Valesey's place of employment as

claimed by Officer Milite, or at the station-house as claimed by Valesey at trial. Upon confronting Berland's photograph, the witness immediately declared that this was the individual he had seen on the afternoon of the Bronxville bank robbery. A discrepancy in the hair style of the pictured suspect was noted by Valesey, and Detective Milite suggested that the subject may have been wearing a wig at the time the photograph was taken. Holding his finger over the suspect's hairline, the witness announced that he was "positive" that this was the man he had previously described to the police.

Thereafter, the police officer informed Valesey that he had indeed selected the picture of an individual suspected of having committed the Bronxville bank robbery, and a statement was taken from the witness which was utilized the following morning to obtain an arrest warrant for Berland. The warrant was promptly executed at the motel where Berland was staying. Apparently two rooms were held in Berland's name. Upon entering one, the police found only a tackle box containing, *inter alia*, Ax's driver's license and social security card. The box, together with its contents, was seized. Berland was arrested in the adjoining room, where two handguns were seized. One was identified as the weapon which Leonardi had admitted selling to Berland and Ax. Later ballistics tests indicated that this was the gun fired by Berland while fleeing the New Rochelle robbery.

On the following day Ax was apprehended while in the midst of the armed robbery of a check-cashing business. While being questioned by agents of the Federal Bureau of Investigation, Ax was confronted with evidence of his complicity in the two Westchester bank robberies, including his driver's license which had been found in the tackle box. Ax admitted his participation in the two crimes, and commenced his cooperation with federal authorities by giving four short signed statements. Pursuant to a written plea agreement with the United States Attorney, Ax later appeared as a government witness against Leonardi and Berland.

As a result of these events, Berland and Leonardi were charged in three counts (one through three) of a superseding indictment with conspiracy, robbery and armed robbery of the Bronxville bank, and Berland and Sicoli were similarly accused in three counts (five through seven) with respect to the New Rochelle bank. Ax was cited as an unindicted co-conspirator in both exploits, and Leonardi alone was named in count four as having received a portion of the proceeds of the first robbery.

After a suppression hearing, the district court held the search of the motel room adjacent to the one in which Berland was arrested had violated the Fourth Amendment. Accordingly, the contents of the tackle box, to wit, Ax's driver's license and social security card, were suppressed. Furthermore, the trial court determined on the basis of Detective Milite's testimony that no suggestiveness had tainted Valesey's identification of Berland, that Valesey's appearance at the pretrial hearing should not therefore be required, and that a subsequent in-court identification by that witness of Berland would be permitted.

Despite renewed applications as to the contested identification, trial was conducted in accordance with the court's earlier rulings. In conformity with his plea agreement, Ax appeared as a government witness and testified at considerable length. The following exchange took place with respect to Ax's statements made to the FBI agents the day after his arrest in Queens:

Q. What was it they said to you that made you decide to give the information about Mr. Berland?

A. They asked if I knew him, and they had my driver's license they found on him that he had.

Ax's testimony as to his motivation for testifying began as follows:

Q. What was it that prompted your decision to testify for the government?

A. Well, a plea bargain.

Well after Ax had finished testifying, Berland moved to strike his entire testimony on the ground, not previously advanced,

that the testimony was the fruit of the illegal search of Berland's tackle box. The district court denied the motion.

At the conclusion of the government's case, Judge Tenney granted Leonardi's motion for acquittal on the bank robbery charges of the indictment (counts one through three). The jury later returned verdicts finding Berland guilty as charged, convicting Leonardi on the charge of receiving the proceeds of a bank robbery (count four), and acquitting Sicoli of all charges. Upon sentencing the district court deemed the robbery and armed robbery counts to have merged, *Grimes v. United States*, 607 F.2d 6, 15 (2d Cir. 1979), and remanded Berland to prison for 12 years. Leonardi was given a two year jail term.

## II.

Berland raises two points on appeal. First, he asserts that the trial court erred in refusing to strike Ax's testimony as a government witness because the cooperation of his erstwhile confederate was allegedly the product of the illegal seizure of the tackle box, the contents of which included the incriminatory driver's license. Second, he challenges the propriety of Valesey's identification of him at trial as the individual seen fleeing the vicinity of the Bronxville bank robbery on the ground that such testimony was tainted by impermissibly suggestive circumstances surrounding the photographic array and by the police officer's remark concerning the correctness of the witness' recognition of Berland's picture. Neither argument is persuasive.

A. *The Testimony of Samuel Ax as the Fruit of an Illegal Search.*

In order to discourage disregard of Fourth Amendment guarantees, the Supreme Court long ago promulgated the exclusionary rule, requiring the suppression at trial of evidence discovered as the direct or remote consequence of an unreasonable government search. *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). In both theory and application, the prohibition encompasses all manner of evidence so derived, whether it be simple physical evidence or the testimony of witnesses whose identities and knowledge of the matters under investigation are revealed as a result of the illicit intrusion of law enforcement authorities. *Wong Sun v. United States*, 371 U.S. 471, 485, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963); *United States v. Karathanos*, 531 F.2d 26, 32–35 (2d Cir.), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3221, 49 L.Ed.2d 1217 (1976); *United States v. Tane*, 329 F.2d 848, 853 (2d Cir. 1964).

Almost simultaneously with the formulation of the exclusionary rule came the recognition that an illegal search did not irrevocably bar the use of the evidence uncovered against all persons for all purposes. To the contrary, it was understood that the link between the improper search and the evidence revealed might be so attenuated that admission of the evidence at trial would not tend to encourage future violations. For example, evidence may be revealed by means independent of the unreasonable intrusion, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), or subject to inevitable discovery through lawful means, *United States v. Falley*, 489 F.2d 33, 40–41 (2d Cir. 1973); *United States v. Cole*, 463 F.2d 163, 173–74 (2d Cir.), *cert. denied*, 409 U.S. 942, 93 S.Ct. 238, 34 L.Ed.2d 193 (1972). Alternatively, intervening events such as the acquiescence of the person whose privacy rights have been compromised might tend to dissipate the taint. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). Thus, an incriminating statement made following an improper arrest and therefore subject to suppression will be admissible when repeated under noncoercive circumstances, *Brown v. Illinois*, 422 U.S. 590, 602, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975); *see also Dunaway v. New York*, 442 U.S. 200, 215, 99 S.Ct. 2248, 2258, 60 L.Ed2d 824 (1979). The voluntariness of the subsequent admission is held to purge the primary taint, *Wong Sun v. United States, supra*, 371 U.S. at 486, 83 S.Ct. at 416, and therefore the rationale of the exclusionary rule would not be furthered by suppression.

■ Recently, the Supreme Court has held that where the identity and potential usefulness of a witness is revealed as the result of an unlawful search, the willingness of that individual to testify despite the illegal intrusion represents a significant attenuation of the link between the police misconduct and its evidentiary fruits. *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). Where the cooperation of such a "found" witness is truly the product of that individual's free will, unaffected by the illicit search, the purpose of the exclusionary rule would not be served by disallowing the testimony. Thus, *Ceccolini* directs us to assess the effect of the search upon the exercise of the witness' free will, and where cooperation is not induced by the police misconduct, testimony will be received notwithstanding that the unreasonable intrusion was one step in the series of events which led to the witness' testifying. In making that determination, *Ceccolini* bids us consider the stated willingness of the witness to testify, the role played by the illegally seized evidence in gaining his cooperation, the proximity between the illegal behavior, the decision to cooperate and the actual testimony at trial, and the police motivation in conducting the search.

■ Applying this attenuation analysis to the case at bar, it is apparent that Berland's thesis confers undue prominence on the role the discovery of Ax's driver's license played in his later decision to appear as a government witness. It is true that the situation is in some respects more compelling than in *Ceccolini*. For example, Ax, unlike the "found" witness in that case, was not an innocent, uninvolved third party whose willingness to divulge information might be attributable to a sense of civic duty. It is also the fact that however innocent the entry into the unoccupied motel room, the seizure by the police of the contents of the tackle box was part of a deliberate search for evidence. Also, as appellant stresses, Ax was confronted with the fruits of the illegal search at the time his cooperation was first solicited and he later characterized that fact as motivating his testimony inculpating Berland. Nonetheless, to find that the seizure of his driver's license played a meaningful role in Ax's decision a month later to become a government witness as part of a plea agreement would have required the district court to ignore far more significant aspects of the situation.

First, Ax's existence, identity and potential value as a witness were established prior to the seizure of Berland's tackle box. Leonardi had already inculpated Ax by name and description, and the discovery of Ax's driver's license among the effects of his accomplice did little more than corroborate that information. The license was in no way used to locate or apprehend Ax; in short, he was not a "found" witness whose existence became known to the authorities only as a consequence of the illicit search. Cf. *United States v. Scios*, 590 F.2d 956 (D.C.Cir.1978).

Second, the evidence so obtained did not, in itself, implicate Ax in any criminal wrongdoing, much less armed bank robbery. Indeed, the driver's license and social security card were meaningless in the absence of other evidence except to suggest association between Berland and Ax. Compare, *United States v. Tane, supra* (witness' cooperation secured through illegal wiretap which directly implicated him in improper payment to union official). This fact was not lost on Ax, no stranger to the criminal justice system, and one who was presumably capable of assessing the merits of the case against him. Certainly the other evidence against Ax was no doubt more troublesome to him than the recovery of his driver's license and social security card from Berland's effects. Leonardi, who had joined them immediately after the Bronxville robbery and was made privy to the details of its perpetration, had implicated him by name. While the trial record does not indicate whether that fact was expressly conveyed to Ax by the FBI agents, Ax did state that he was aware that a warrant for his arrest had been issued which would, of necessity, have been based upon Leonardi's disclosures. Additionally, at the time of Ax's arrest, he was in posses-

sion of a .30 caliber carbine thought to have been the gun wielded by Berland in both Westchester bank robberies. Ax could no doubt recall that neither operation was the perfect crime; the Bronxville job having been compromised by Valesey's pursuit and the New Rochelle holdup by the exchange of gunfire with the security guard. Ax was also aware that Berland had been implicated, and was no doubt concerned that his colleague would cooperate with the government, thereby diminishing Ax's ability to plea bargain effectively. Recognizing the strength of the case building against him, Ax apparently decided to cooperate because, in his own fatalistic view, "they [the FBI] would come and get me anyway."

Finally, and most importantly, Ax had been caught in *flagrante delicto* committing another armed robbery. With a conviction certain to result from that escapade, Ax faced substantial jail time. It is likely that Ax decided to cooperate as a matter of self interest, and not due in any significant degree to the belief that the discovery of his driver's license among Berland's belongings had irreparably implicated him in the Westchester robberies. That his testimony was the "product of detached reflection and a desire to be cooperative," *United States v. Ceccolini, supra,* 435 U.S. at 277, 98 S.Ct. 1060, was attested to by Ax himself on at least four occasions: upon the giving of his first written statements, upon entering into his plea agreement, during his sworn allocution before the district court, and in the course of his trial testimony.

Indeed, it may be equally feasible to dispose of this claim by holding that there was no relationship at all between the seizure of Ax's driver's license and his eventual transformation into a government witness as to assume that a connection existed, but was attenuated. Certainly Berland's contention that Ax's testimony derived from the illegal search was a most adventitious one, resting entirely upon a belated interpretation of an ambiguous response given during his cross-examination of Ax. Thus, Ax was asked, "What was it they [the FBI] said to you that made you decide to give the information about Mr. Berland?" to which the witness replied, "They asked me if I knew him, and they had my driver's license they found on him that he had."

When viewed in proper context, the claim is tenuous at best. The thrust of the line of inquiry being pursued was an attempt to elicit that Ax's initial admissions had been obtained through crude physical coercion, and in denying that charge, Ax not only seemed to express through his answer an awareness of the substantial evidence against him, but later stated affirmatively that his confession was an act of free will. At the time it was given, neither the trial judge nor Berland's counsel understood his statement concerning his reasons for inculpating Berland as indicating a link between the illegal search and his decision to cooperate. It was only after the lengthy examination of Ax had concluded that Berland moved to strike his testimony on the grounds that it was the product of the illegal search.

Ax's remaining testimony could support the proposition that while his own admissions were perhaps attributable to the seizure of his driver's license, his appearance as a government witness was traceable only to the plea agreement entered into a month later, and which was theoretically the result of a separate act of volition. In this regard, Ax denied that he had determined before or during the December 8 meeting with the FBI that he would fully cooperate, and claimed that his decision to testify actually derived from the subsequent plea agreement, not his initial admissions.

However, to find that there was no relationship between Ax's course of action and the illicit seizure of his driver's license would strip his own statement, made under cross-examination, of its literal import. Also, to hold that Ax's later decision to enter a plea arrangement which called for his testimony as a government witness was separable from his initial confession and represented a distinct act of volition is somewhat unrealistic and artificial.

Whether viewed as an absence of causation, or as seems preferable, considered in

the light of a *Ceccolini* attenuation analysis, we cannot conclude that Judge Tenney erred in determining that the government sustained its burden of demonstrating that Ax's cooperation was procured independently of the illegal search.

### B. *Identification of Berland at Trial.*

Berland advances the claim that his in-court identification by Valesey was improperly admitted into evidence because it was tainted by a suggestive pretrial identification and there was therefore a "substantial likelihood of irreparable misidentification," *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). Appellant does not assail the fairness of the photo-spread from which Valesey first identified Berland. This spread was properly preserved and submitted to the district court during the pretrial suppression hearing. Rather, it is argued that the witness was primed for making a positive identification from the photo-spread by the aura of expectancy which the police engendered. This climate was allegedly created by their insistence that Valesey come to the stationhouse to view the array, despite the extremely late hour, in contrast to their prior, more casual practice of simply appearing at Valesey's place of employment, presumably at reasonable hours, with the viewing material. This unusual conduct was compounded in Berland's view when, after the witness had selected Berland's picture, the police officer assured him that he had recognized their suspect. Finally, it is averred that the trial court wrongly denied Berland the opportunity to develop a full pretrial record on the issue by refusing to compel Valesey's appearance at the hearing and determining solely on Detective Milite's testimony that no improper suggestiveness had been demonstrated and that an in-court identification of Berland by the witness would be permitted. Again, these claims are unavailing.

Under the Supreme Court's teachings, we must measure the propriety of receiving Valesey's testimony under a two-part test. It must be determined if the pretrial identification was suggestive, and if so, whether that fact, under the totality of the circumstances, rendered a subsequent identification at trial so unreliable as to require its exclusion from evidence. *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Neil v. Biggers*, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *see also Jackson v. Fogg*, 589 F.2d 108, 111 (2d Cir. 1978). Appellant's contentions fail under both prongs of this test.

### 1. *Suggestiveness.*

Assuming contrary to Valesey's own testimony that the atmosphere surrounding the photo-display procedure was one of heightened expectation, because of either the timing or the location, these circumstances were clearly not such as to taint the identification. It should be noted at the outset that Berland's theory is premised on the notion that the police conducted the first three photo-spreads with little or no hope of success. It would defy common sense to believe that the police would engage in such empty exercises, or that they would transmit a sense of pessimism to a witness whom they undoubtedly hoped would provide them with a significant break in the case.

However, even if the witness could have discerned an air of confidence previously lacking in the officer's demeanor, he was still faced with the substantial challenge of picking appellant's picture from among five or six others. His success in this test tends to discredit Berland's claim that Valesey was goaded into a speculative or unreliable identification. Moreover, this Court has recently held that police optimism, even when explicitly conveyed to a witness, does not invalidate an otherwise proper photo-spread. In *United States v. Danzey*, 594 F.2d 905, 915–16 (2d Cir. 1979), an eyewitness' viewing of a photographic array was prefaced by an agent's remark that the two suspects had been apprehended and were now in custody. Despite this express invitation to make a positive identification, obviously more compelling than the unspoken

encouragement in the present case, we held that remark to be an insufficient ground on which to bar a subsequent in-court identification.

Neither was the procedure in the instant case compromised by the police officer's comment following the selection of appellant's picture from the photo-spread that the witness had chosen the individual under suspicion. We have in the past criticized this procedure, since it may tend to reinforce an otherwise weak or tentative identification and therefore lend a later in-court identification greater conviction than it deserves. *United States v. Moskowitz*, 581 F.2d 14, 20 (2d Cir.), *cert. denied*, 439 U.S. 871, 99 S.Ct. 204, 58 L.Ed.2d 184 (1978). Nonetheless, we have never intimated that such a remark automatically taints subsequent trial testimony. Indeed, such a rule would be incompatible with other necessary police procedures which indirectly signal a witness that he has selected the person under investigation. For example, as in the present case, following the photo-spread identification, a witness may be asked to give a sworn statement, or else to appear before a grand jury, or to aid the police in other ways, all of which might confirm the "correctness" of his choice. While we do not encourage or condone this practice, where the identification is strong and unequivocal, as it was in this case, a misguided post-viewing remark will not render it invalid, and will not preclude a subsequent in-court identification. *United States v. Jarvis*, 560 F.2d 494, 499 (2d Cir. 1977).

Since appellant failed to make a threshold showing that the surrounding circumstances or actual conduct of the December 5 photo-spread were suggestive, the district court properly refused to require the pretrial testimony of Valesey. A review of his statements at trial fully supports the trial judge's conclusion that he would not have significantly aided appellant's cause. To the extent that some discrepancies emerged between his version of the events and that given by Detective Milite, those inconsistencies were either irrelevant to the issue of suggestiveness, or went only to the weight to be given the identification, not to its admissibility. *United States v. Bubar*, 567 F.2d 192, 197–99 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977). Accordingly, the district court did not improperly circumscribe the scope of the pretrial hearing or prematurely determine the propriety of permitting the in-court identification of Berland.

### 2. *Reliability.*

Even assuming a degree of suggestiveness in the conduct of the December 5 photo-spread, under the circumstances of this case it is clear that appellant's in-court identification was properly admitted into evidence. Under *Manson v. Brathwaite, supra*, a suggestive pretrial identification will bar subsequent identification in the jury's presence only when, under the "totality of the circumstances," the prior procedure gives rise to a "very substantial likelihood of irreparable misidentification," *id.* 432 U.S. at 116, 97 S.Ct. at 2254. *See also United States v. Sanchez*, 603 F.2d 381, 385–86 (2d Cir. 1979). As articulated in the case law, the factors to be considered include:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *see also United States v. DiPalermo*, 606 F.2d 17, 21 (2d Cir. 1979).

Judged by these criteria, Valesey's identification at trial was reliable. The witness had an excellent vantage from which to observe Berland's image, both as he fled the scene of the crime, and later, when, as a passenger in the getaway car, he turned and fully revealed himself to Valesey who was following him. Although Berland was attempting to escape as quickly as possible, the witness had a total of between 20 and 25 seconds to focus upon him. That amount

of time has been held more than sufficient to render an identification dependable, *see Coleman v. Alabama*, 399 U.S. 1, 4, 90 S.Ct. 1999, 26 L.Ed.2d 387 (1970) (culprit's face momentarily illuminated by light of passing car); *Manson v. Brathwaite, supra*, 432 U.S. at 129, 97 S.Ct. at 2260 (15 to 20 seconds); *United States v. Williams*, 596 F.2d 44, 46, 49 (2d Cir. 1979) (witness observed defendants walk down street and enter bank); *United States v. Danzey, supra*, 594 F.2d at 909 (2d Cir. 1979) (witness had suspects in view while they changed cars).

Obviously, Valesey was alert and his sensitivities were no doubt sharpened by his well-founded belief that appellant had just committed a crime. While not a person trained in the observation of criminal activities, *United States v. Sanchez, supra*, 603 F.2d at 385–86, this witness was concerned and highly motivated to the point of endangering himself by attempting to trail these armed bank robbers. He concentrated on Berland's face quite possibly with the expectation of describing and identifying him to the police. The montage he later created was in fact remarkably accurate, *see United States v. Marchand*, 564 F.2d 983, 996 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 732, 54 L.Ed.2d 760 (1978), notwithstanding his initial, subjective characterization of those features as "Hispanic." The witness was confident of his identification, stating that he was "positive" that Berland was the individual he had carefully observed, and his self assurance was obviously justified in light of his refusal during three previous photo-spreads to identify anyone. He was not a person "readily susceptible to suggestive influences," *United States v. Williams, supra*, 596 F.2d at 49, *quoting United States v. Famulari*, 447 F.2d 1377, 1381 (2d Cir. 1971). He accurately selected Berland's photograph out of at least twenty others which had been displayed to him over the course of the four photo-spreads. While the three and one-half month interval between the crime and the witness' positive identification of Berland may be somewhat longer than in the usual case, but *cf. United States v. Williams, supra*, 596 F.2d at 45–47 (five month lapse between observation of crime and identification did not preclude in-court identification), the reliability of this delayed identification was well established. For all these reasons, Valesey's testimony was properly admitted at trial.

### III.

Leonardi's chief claim on appeal is that he was improperly restricted in his cross-examination of Ax. In particular, he cites the trial judge's refusal to admit into evidence exhibit 3522 for identification, an FBI agent's summary of the initial interview with Ax, which report failed to recite that Leonardi had been paid only after the Bronxville robbery and neglected to mention the sale of the second handgun. Leonardi urged introduction of this document into evidence on the ground that the omissions noted above constituted prior inconsistent statements by Ax. Additionally, Leonardi complains that he was precluded from eliciting from the government's chief witness the fact that Sicoli had sold Berland the .30 caliber carbine, which evidence in Leonardi's view might have led the jury to infer that Sicoli was also the source of the handguns. This, in turn, would make it less likely that Leonardi would have received any portion of the proceeds of the Bronxville bank robbery. These contentions are without merit.

The FBI agent's memorandum was correctly excluded since it was not inconsistent with the witness' trial testimony, nor could it properly be attributed to Ax for impeachment purposes. Under certain circumstances prior silence concerning critical facts might be deemed inconsistent with later testimony which includes their purported recollection. However, for this to be the case, the failure to mention those matters must conflict with that which is later recalled. Where the belatedly recollected facts merely augment that which was originally described, the prior silence is often simply too ambiguous to have any probative force, *United States v. Hale*, 422 U.S. 171, 176, 95 S.Ct. 2133, 2136, 45 L.Ed.2d 99

(1974), and accordingly is not sufficiently inconsistent to be admitted for purposes of impeachment. *Victory v. Bombard,* 570 F.2d 66, 70 (2d Cir. 1978). Such is the case here, since Ax's failure at his initial interview to apprise the FBI of the second handgun or the timing of Leonardi's payment did not necessarily contradict his testimony at trial.

■ Furthermore, the written statement of the FBI agent was not attributable to Ax. Prior to his cross-examination, Ax had never seen the document, which had been created some five days after the interview and did not purport to memorialize all of Ax's statements. We have only recently reiterated the rule that a witness may not be charged with a third party's characterization of his statements unless the witness has subscribed to them. *United States v. Rubin,* 609 F.2d 51, 62 (2d Cir. 1979) (third party's summary of witness' statements may be used as prior consistent statement where witness has previously adopted the document as his own). Consequently, exhibit 3522 for identification was properly rejected as a prior inconsistent statement of Ax.

■ The court's direction to Leonardi not to elicit testimony from Ax to the effect that Sicoli was the source of the carbine presents a somewhat more substantial claim, but one which must also be rejected. Prior to trial, the government informed defense counsel that it had reason to believe that Sicoli had supplied this weapon, but that it did not intend to submit evidence on this point, preferring to base Sicoli's involvement in the New Rochelle robbery upon his initial nomination of the target bank, his surveillance of the bank's environs, and his aid in planning an escape route. Sicoli's counsel moved for a formal direction barring testimony concerning his client's purported sale of the carbine, and Leonardi's counsel, after initial concurrence, opposed its suppression, hoping to argue that if Leonardi had not provided the carbine, then it was less likely that he had supplied the handguns. Judge Tenney, attempting to accommodate both sides, fash-ioned a compromise whereby Ax testified, in response to the court's questions, that an unidentified person other than Leonardi was the source of the carbine.

We hold that the trial court acted well within its discretion in limiting cross-examination in this manner. *United States v. Carr,* 584 F.2d 612, 617 (2d Cir.), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Judge Tenney's ruling did not foreclose Leonardi from suggesting to the jury that because another individual had supplied the carbine, the same person had also supplied the handguns. Such a theory did not depend on establishing Sicoli as the source of the carbine. Counsel's failure vigorously to pursue this line of attack cannot be blamed on any constraints imposed by the court.

■ Leonardi's remaining claims need not detain us. The exclusion of evidence that Ax, who had admitted before the jury to being a drug addict, had met with Berland at a methadone clinic where the latter was reputedly undergoing treatment for narcotics abuse was entirely proper since the situs of those meetings did not further impeach Ax's credibility and posed some threat of prejudice to Berland. Likewise, the court correctly applied Rule 608(b), Fed.R.Evid., to bar evidence of Ax's prior criminal acts not resulting in conviction and which did not, by their nature, tend to impugn the witness' credibility. *United States v. Rabinowitz,* 578 F.2d 910, 912 (2d Cir. 1978).

Particularly when considered in light of the otherwise lengthy and searching cross-examinations to which Ax was subjected, *see United States v. Pacelli,* 521 F.2d 135, 137 (2d Cir. 1975), *cert. denied,* 424 U.S. 911, 96 S.Ct. 1106, 47 L.Ed.2d 314 (1976), we find that the limitations ordered by the trial court were proper, and in no way deprived appellant of his right of confrontation, *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

The judgments of conviction are affirmed.