23CA0799 Peo v Higdon 04-30-2026

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA0799
Boulder County District Court No. 21CR795
Honorable Bruce Langer, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Charles G. Higdon III,

Defendant-Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division IV
Opinion by JUDGE BROWN
Freyre and Schutz, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced April 30, 2026

---

Philip J. Weiser, Attorney General, Cata A. Cuneo, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Meredith K. Rose, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Charles G. Higdon III, appeals the judgment of conviction entered on a jury verdict finding him guilty of sexual assault of a victim incapable of appraising the nature of her conduct. We reverse and remand for a new trial.

## I.    Background

¶ 2    The evidence presented at trial would have allowed the jury to find the following facts.

¶ 3    In November 2020, Higdon was having dinner and whiskey at a restaurant while waiting for his friend, Josh, to arrive. C.F-L. and her friend, R.M., were seated at a table near Higdon, and they ordered some food and martinis. Higdon later joined C.F-L. and R.M. at their table and bought them shots of whiskey. Once Josh arrived, he joined the group.

¶ 4    Over the course of approximately two hours, Higdon, C.F-L., and R.M. had about five to six drinks each, and Josh had one beer. When everyone got up to leave, R.M. said C.F-L. seemed "pretty buzzed" but not "wasted." R.M. and C.F-L. separated on the way out of the restaurant, and R.M. ended up driving home without C.F-L.

¶ 5     On his way out, Higdon also separated from the group but later found Josh and C.F-L. in Josh's car.  Eventually, Higdon got into the backseat of the car with C.F-L.  Higdon said C.F-L. was friendly and "somewhat excited" when he joined her, and she reached between his legs to touch his penis over his clothes.

¶ 6     Josh drove them to Higdon's home.  Higdon said he and C.F-L. were "fooling around" in the backseat during the drive.  He said they were kissing, rubbing each other's lower body, and loosening each other's pants for access.  They arrived at Higdon's house around 7:20 p.m.  Surveillance footage from a camera at the front of Higdon's house showed C.F-L. almost falling over but steadying herself on a fence, then walking unsteadily and falling backwards onto the ground.  Higdon fell down with her.  Higdon helped C.F-L. stand up, but she immediately fell over again.  Higdon helped C.F-L. get up again, and she walked into his house.  Higdon testified that they were both "hammered" at that point.

¶ 7     Higdon's roommate testified that as soon as the pair walked into the house, they immediately fell onto the ground and then crawled over to the couch.  The roommate said that Higdon and C.F-L. were kissing each other and that it appeared consensual, but

2

they both were in and out of consciousness.  The roommate observed this behavior for about a half hour.  The roommate went to sleep before the pair left the living room but said he heard "moaning and groaning" in the middle of the night.  The roommate testified that he could not tell who was moaning, but he had previously told officers that it was C.F-L.

¶ 8     Higdon said that C.F-L. needed help getting to his bedroom and fell down again after getting up from the couch.  Once inside Higdon's bedroom, C.F-L. took off her clothing but kept her underwear on, and they both fell asleep for about an hour and a half.  Higdon said he woke up to C.F-L. rubbing his hip and the side of his waist.  He took his underwear off because he had peed himself.  Then he and C.F-L. caressed and kissed each other, and C.F-L. put her hand between his legs and touched his penis.  Higdon rolled on top of C.F-L. and they were both thrusting and grinding on each other, but then Higdon was unable to get an erection, so C.F-L. pushed him away.

¶ 9     Higdon said he then put his arms around C.F-L., and she put his hand in between her legs on her vaginal area, so he started rubbing and caressing her there.  Higdon said C.F-L. responded by

3

"leaning back and putting her head into [his] neck" and rubbing his arms and hands. Higdon said he started to kiss C.F-L.'s hips and legs. He said she made "noises of pleasure" and lifted her hips and lower back to assist him in taking off her underwear. Higdon then performed oral sex on C.F-L. and put his fingers in her vagina. He said she responded "aggressively and intense[ly]" by "grabbing [his] hair and pulling [his] face . . . in between her legs." He said C.F-L. then told him to stop, so he did. He tried to see if C.F-L. would perform oral sex on him, but she turned her head and told him to get away, so Higdon laid back down, and the two cuddled. When Higdon next woke up around 11 p.m., he said C.F-L. was sitting up, her demeanor had changed, and "[s]he was insistent that" he get his phone "immediately."

¶ 10    C.F-L. testified that she did not remember leaving the restaurant and that the next thing she remembered was laying down somewhere, seeing a painting, and then "going black." Then she remembered sensing something happening around her vaginal area. She recalled that she was laying on her stomach, felt pain in the back in her private areas, and tried to "scoot" away. C.F-L. said the next memory she had was sitting up in a bed, not recognizing

4

the naked person next to her, asking to use the restroom, and then using Higdon's phone to call her son. C.F-L. found out that her son had reported her missing.

¶ 11 Higdon lived across the street from a police station, so C.F-L. walked out of Higdon's house to a police car parked across the street. Higdon spoke briefly with police officers that night, but they did not arrest him at that time.

¶ 12 A sexual assault nurse examiner (SANE) conducted an examination of C.F-L. and observed "petechiae" — bleeding under the skin caused by blunt force trauma — around her urethra and "erythema" — reddened skin caused by injury or irritation — around her hymen. The SANE was unable to perform a pelvic exam because C.F-L. said it was too painful.

¶ 13 The prosecution charged Higdon with one count of sexual assault — victim helpless and one count of sexual assault — victim incapable of appraising the nature of her conduct. After a six-day trial, a jury acquitted Higdon of sexual assault — victim helpless but found Higdon guilty of sexual assault — victim incapable of appraising the nature of her conduct. The district court sentenced Higdon to six years in the custody of the Department of Corrections.

## II.    Analysis

¶ 14    On appeal, Higdon contends that the district court erred by (1) excluding evidence that C.F-L. pleaded guilty to false reporting in a separate case from 1998; (2) instructing the jury that it may not consider evidence of Higdon's self-induced intoxication for purposes of deciding whether the prosecution proved the elements of the sexual assault charge without also instructing the jury that it could consider such evidence when assessing whether Higdon knew C.F-L. was incapable of appraising the nature of her own conduct; (3) finding that Higdon was on probation, which increased his sentencing range, rather than submitting that question to a jury; and (4) allowing the prosecutor to use Higdon's post-*Miranda* silence to imply his guilt in violation of his due process rights. Higdon also contends that even if no single claim warrants relief, the cumulative prejudice from the alleged errors requires reversal.

¶ 15    We conclude that the district court reversibly erred by allowing the prosecutor to cross-examine Higdon about, and comment during closing argument on, his post-*Miranda* silence. We do not address Higdon's other contentions because they are unlikely to arise in the same context on remand. *See People v. Weinreich*, 98

P.3d 920, 924 (Colo. App. 2004) (declining to address evidentiary issue unlikely to arise "in the same context" on retrial), *aff'd*, 119 P.3d 1073 (Colo. 2005).

### A. Standard of Review and Applicable Law

¶ 16    We review de novo whether a prosecutor's comments on a defendant's post-*Miranda* silence violated his due process rights. *People v. Castro*, 2022 COA 101, ¶ 20.

¶ 17    The parties agree that this issue is unpreserved, so we will reverse only for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. For an error to be plain, it must be both obvious and substantial. *Id.* An error is obvious if it contravenes a statute or rule, a well-settled legal principle, or established Colorado case law. *Campbell v. People*, 2020 CO 49, ¶ 25. An error is substantial if it "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Hagos*, ¶ 14 (citation omitted).

¶ 18    Every person has a constitutional right to remain silent during police questioning. *See* U.S. Const. amend. V; *Miranda v. Arizona*, 384 U.S. 436, 460-61 (1966). Before a custodial interrogation, police must inform a suspect "that he has a right to remain silent,

that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444.

¶ 19    It is improper for a prosecutor to allude to a defendant's exercise of his right to remain silent "as indicating a consciousness of guilt," *People v. Wright*, 511 P.2d 460, 462 (Colo. 1973), "because the *Miranda* warnings implicitly assure the defendant that his silence will carry no penalty," *People v. Davis*, 312 P.3d 193, 198 (Colo. App. 2010) (citing *Doyle v. Ohio*, 426 U.S. 610, 619 (1976)), *aff'd*, 2013 CO 57.  "Thus, use of an accused's post-arrest silence for impeachment purposes, after *Miranda* warnings have been given, violates due process of law."  *People v. Hardiway*, 874 P.2d 425, 427 (Colo. App. 1993).

¶ 20    If a defendant makes a post-*Miranda* statement and then testifies differently at trial, however, "a different rule applies," and "the prosecution may cross-examine the defendant on inconsistencies between the two statements."  *Castro*, ¶ 32 (quoting *Hardiway*, 874 P.2d at 427).  The prosecution may also "cross-examine the defendant on omissions in the first statement insofar as such omissions are inconsistent with the defendant's

testimony at trial." *Id.* (quoting *Hardiway*, 874 P.2d at 427). But before a defendant's "prior silence concerning critical facts [can] be deemed inconsistent with later testimony which includes their purported recollection[,] . . . the failure to mention those matters must conflict with that which is later recalled." *Hardiway*, 874 P.2d at 428 (quoting *United States v. Leonardi*, 623 F.2d 746, 756 (2d Cir. 1980)). If instead a defendant's trial testimony "merely augment[s] that which was originally described, the prior silence is often simply too ambiguous to have any probative force" and is not admissible for impeachment purposes. *Id.* (quoting *Leonardi*, 623 F.2d at 756-57).

## B.  Additional Background

¶ 21    In May 2021, the police arrested Higdon and took him to the police station for questioning. Detective Estaban Lopez testified that Higdon asked to speak with him at the station. No one disputes that Higdon was advised of his *Miranda* rights before that encounter.

¶ 22    Detective Lopez testified that

> [Higdon] was wondering why he had been
> arrested for sexual assault and mentioned that
> he didn't keep her there against her will or

anything like that. So, I, you know, kind of answered that question for him. And we did revisit a few of the different topics. He denied putting anything in her drink. I didn't specifically ask if he put anything in her — in her food. But again, he — he denied putting anything in — in her drink.

[Higdon] said that they didn't have sex, but it was because she didn't want to, as opposed to [what he told officers on the night of incident], where he was just unable to become erect. We talked a little bit about his level of intoxication at that time, as — as well as hers. He put himself, if I remember correctly, at about a [five] or [six] on a scale of [zero] to [ten] as far as how intoxicated he felt. Nonetheless, he said they were both able to communicate with each other clearly. He said it wasn't like they were . . . unconscious or anything like that. He also mentioned his conversation with [the roommate] and said that [the roommate] was making fun of him for bringing home a female that [the roommate] did not find attractive. He said he didn't remember [the roommate] telling him that she was too drunk.

¶ 23    During direct examination, defense counsel asked Higdon to explain what he meant when he told the detective that he and C.F-L. did not have sex because she did not want to. Higdon responded, "I was referring to the attempt to have intercourse, not being able to, and then the fact that when she — when I asked for oral sex and she said no that she did not want to."

10

¶ 24     During the prosecutor's cross-examination of Higdon, the

following exchange took place:

> [PROSECUTOR]: And you did not provide
> [Detective Lopez] with any information about
> this Josh?
>
> [HIGDON]: I was not asked.
>
> [PROSECUTOR]: Okay.  You weren't asked, but
> you didn't think that would be important for
> the detective to consider?
>
> [HIGDON]: I would have definitely been willing
> to give it to him.
>
> [PROSECUTOR]: Okay.  But you did not
> provide it to him?
>
> [HIGDON]: No.

Later, the prosecutor and Higdon had the following colloquy:

> [PROSECUTOR]: Okay.  Now Mr. Higdon, I
> have a few more questions for you.  I want to
> talk to you a little bit about your conversation
> with [Detective] Lopez.  Okay?
>
> [HIGDON]: Okay.
>
> [PROSECUTOR]: Do you remember that
> conversation?
>
> [HIGDON]: I do.
>
> [PROSECUTOR]: And that conversation is the
> one you talked about with [defense counsel]
> that happened in May of 2021, right?
>
> [HIGDON]: Yes.

11

[PROSECUTOR]: And that conversation actually came at your request?

[HIGDON]: Correct.

. . . .

[PROSECUTOR]: Okay. As you were getting ready to speak with the detective, did you start to think about the details that you might want to share with him about what had happened?

[HIGDON]: No. There was a lot to think about.

[PROSECUTOR]: You didn't think when you requested to speak to the investigative detective —

[HIGDON]: I had one question.

[PROSECUTOR]: You had one question. Okay. But you didn't think that he was potentially going to ask you some questions or give you an opportunity to say something?

[HIGDON]: No.

[PROSECUTOR]: Okay. But he did give you that opportunity, didn't he?

[HIGDON]: Yes.

[PROSECUTOR]: Okay. And in terms of the details you provided to him, you didn't tell him a lot of the things that you talked about today, right?

[HIGDON]: I was very nervous. I could hardly speak.

12

[PROSECUTOR]: But he wasn't forcing you to sit there and talk with him, right?

[HIGDON]: I was being arrested for sexual assault.

[PROSECUTOR]: Correct.

[HIGDON]: Which I thought had — you know, didn't happen, so I was confused. I asked one question. I gave one answer.

[PROSECUTOR]: Okay. But you did talk to him about some of the stuff that happened that night, right?

[HIGDON]: I answered the question he asked, yes.

[PROSECUTOR]: Well, but you told him things were consensual, right?

[HIGDON]: Yes.

[PROSECUTOR]: Okay. And you kept going over that with him, that everything was consensual, right?

[HIGDON]: Yes.

[PROSECUTOR]: But you didn't break it down for him like you did for this jury today, right?

[HIGDON]: No.

[PROSECUTOR]: No. You knew he was investigating you for sexual assault at that point in time, right?

[HIGDON]: Yes. I thought we would have — there would be the time to speak later, and I

13

was — we were barely — it was a short . . . encounter. And again, I was very distraught and nervous from the accusations and the charge that I was being arrested on.

[PROSECUTOR]: You thought you would have time to speak later with [Detective] Lopez?

[HIGDON]: Yes.

[PROSECUTOR]: And that's when you would have provided him with the details?

[HIGDON]: Yes.

[PROSECUTOR]: You know [Detective] Lopez is not hard to find, right?

[HIGDON]: Yes.

. . . .

[PROSECUTOR]: You can talk to him at any point in time?

[HIGDON]: Yes, I had intentions to. And I also had intentions to share Josh's number.

[PROSECUTOR]: But you didn't do those things, did you?

[HIGDON]: No.

. . . .

[PROSECUTOR]: So at some point, the time came when there was a case, right?

[HIGDON]: Yes.

[PROSECUTOR]: You didn't share [Josh's] number?

[HIGDON]: No.

[PROSECUTOR]: Okay. And in terms of giving more details to [Detective] Lopez, you didn't do that, either?

[HIGDON]: No.

In closing argument, the prosecutor told the jury,

You also heard from Mr. Higdon. Mr. Higdon talked to you at length about what he did that day, who he talked to, what he ate, what he drank, all of those things. And he talked to you about the time at [the restaurant]. And he talked to you about the ride home . . . . How he went out to the parking lot. How his buddy Josh was in the driver's seat. How [C.F-L.] was in the passenger seat. How [C.F-L.] got frustrated, went to the back seat, so [Mr. Higdon] got in the front seat.

She was flirting with him, so he went into the back seat, so they kind of fool around a little bit. Josh dropped them off at his house. Right? He remembered those things.

. . . .

None of those details were discussed, not on that night, and not in . . . May of 2021, when [Detective] Lopez talked to him again. At that point in time, he's under arrest for sexual assault. He's still not sharing those details.

15

## C. The District Court Reversibly Erred by Allowing the Prosecutor to Use Higdon's Post-*Miranda* Silence to Imply Guilt

¶ 25    Higdon contends that the prosecutor's cross-examination and comment in closing argument impermissibly implied he was guilty based on his custodial silence in violation of his due process rights. We agree.

¶ 26    To be sure, "not every reference to a defendant's exercise of the right to remain silent requires reversal." *People v. Burnell*, 2019 COA 142, ¶ 45 (citing *People v. Key*, 522 P.2d 719, 720 (Colo. 1974)).  Indeed, if such references are designed "to elicit an explanation for a prior inconsistent statement," they may not be improper.  *Castro*, ¶ 29 (citation omitted).  But if the prosecutor's question or comment was meant to draw meaning from the silence, reversal may be required.  *Id.*  Courts "should consider '(1) whether the improper remarks were used as a means of creating an inference of guilt; and (2) whether the prosecution argued that the defendant's silence constituted an implied admission of guilt.'"  *Davis*, 312 P.3d at 198-99 (citation omitted).

¶ 27    Here, the prosecutor's questions and comment on Higdon's silence were intended to suggest his guilt.  Contrary to the People's

16

assertions on appeal, the record does not support a conclusion that the prosecutor was merely pointing out inconsistencies in Higdon's versions of the event. Beyond noting that Higdon did not identify Josh to the detective, the prosecutor did not ask about any specific details or otherwise point to any inconsistencies between Higdon's statements to Detective Lopez and his testimony at trial. *Cf. People v. Knapp*, 2020 COA 107, ¶¶ 52-53 (questions about details the defendant testified to but did not previously tell police were not improper because they were inconsistent with what the defendant did tell the police — namely, that the fight had only been verbal). Rather, the prosecutor repeatedly asked Higdon about not having provided "the details" to Detective Lopez that he testified to at trial.

¶ 28    Higdon told Detective Lopez that he and C.F-L. had been drinking but that they were not unconscious, that they did not have sex, and that all the sexual contact was consensual. Higdon testified to the same facts at trial, although he added more detail regarding exactly what had happened — including that no sexual acts occurred while C.F-L. was sleeping or unconscious, that he performed oral sex on C.F-L., that C.F-L. responded with pleasure, and that they did not have penetrative sex because he could not get

17

an erection. Because Higdon elaborated on details that were consistent with his prior statement, the prosecutor was not permitted "to inquire into, or comment about, why those details were missing from the original statement." *Castro*, ¶ 34. And because the prosecutor did not impeach Higdon with any inconsistent statements, we perceive no reason for the prosecutor's questions other than to imply Higdon's guilt and to suggest "that an innocent person would have talked with the police sooner and in more detail." *Id.* at ¶ 41.

¶ 29    We are not persuaded otherwise by the People's argument that Higdon did not invoke his right to remain silent because he asked to speak with Detective Lopez and chose to testify at trial.[1] A defendant's right to remain silent, and to not have that silence held against him, "[does not go] out the window as soon as a defendant makes *any* post-*Miranda* statement." *Id.* at ¶ 28 (citation omitted). "The mere fact that [a defendant] may have answered some questions or volunteered some statements on his own does not

---

[1] The People also argue that Higdon did not invoke his right to remain silent when speaking with officers on the night of the incident, but Higdon does not challenge the prosecutor's questions or comments about his pre-arrest statements.

18

deprive him of the right to refrain from answering any further inquiries," *Miranda*, 384 U.S. at 445, "or from volunteering further information, albeit exculpatory information," *People v. Ortega*, 597 P.2d 1034, 1037 (Colo. 1979). *See also Doyle*, 426 U.S. at 617 ("[E]very post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.").

¶ 30 Higdon testified that he asked one question and answered one question during the short encounter with Detective Lopez. Detective Lopez's testimony also reflected that they had a brief conversation. No recording or transcript of the exchange was admitted at trial that contradicted these facts. No one claimed that Higdon told Detective Lopez everything that happened during that brief interview. And there was no evidence that Higdon otherwise waived his right to remain silent or talked at length with the detective. *Cf. Davis*, 312 P.3d at 200-01 (concluding that, "by testifying that he told the detective 'everything,'" the defendant opened the door to the prosecutor's cross-examination about what he omitted from his prior statement); *People v. Lewis*, 2017 COA 147, ¶¶ 32, 35-36 (distinguishing *Ortega* because the defendant gave a nearly fifty-minute videotaped statement to police and told

19

the detective, "There's nothing more to it than that"); *see generally Castro*, ¶ 37 (reaffirming the viability of *Ortega* and *Hardiway* after *Lewis*).

¶ 31    Accordingly, we conclude that the district court erred by allowing the prosecutor to improperly comment on Higdon's post-*Miranda* silence to imply guilt in violation of his constitutional right to due process. *See Ortega*, 597 P.2d at 1036; *Hardiway*, 874 P.2d at 427. And the error was obvious because the law disallowing a prosecutor's use of a defendant's post-*Miranda* silence to imply guilt is well settled. *See Doyle*, 426 U.S. at 619; *Wright*, 511 P.2d at 462; *People v. Coleman*, 2018 COA 67, ¶ 35.

¶ 32    We further conclude that the error was substantial. *See Hagos*, ¶ 14. To evaluate the effect of a prosecutor's comments on a defendant's silence, courts look at the following factors:

> (1) the prosecutor's use of the post-arrest silence; (2) which party elected to pursue the line of questioning; (3) the quantum of other evidence of guilt; (4) the intensity and frequency of the reference; and (5) the trial court's opportunity to grant a motion for mistrial or to give curative instructions.

20

*Castro*, ¶ 40.[2]

¶ 33    As discussed, the prosecutor used Higdon's silence to imply his guilt.  And the prosecutor injected the issue into the case on cross-examination and in closing argument.  *See id.* at ¶ 42.  True, defense counsel asked Higdon to explain what appeared to be an inconsistency between Higdon's statement to officers on the night of the incident — that he and C.F-L. did not have sex because he could not become erect — and his later custodial statements to Detective Lopez — that the two did not have sex because C.F-L. did not want to have sex.  But the prosecutor did not explore that or any other inconsistency in Higdon's statements.  Instead, the prosecutor repeatedly asked why Higdon did not share with Detective Lopez "the details" he testified about at trial, insinuating that Higdon's failure to provide such details to Detective Lopez demonstrated his guilt.

¶ 34    Furthermore, the central dispute at trial was whether Higdon knew C.F-L. was incapable of appraising the nature of her conduct when the two engaged in sexual contact, *see* § 18-3-402(1)(b),

---

[2] In this case, we do not consider the district court's failure to give a curative instruction because Higdon did not object or ask for one.

21

C.R.S. 2025, and the evidence against Higdon was not overwhelming in that regard. R.M. testified that C.F-L. was "pretty buzzed" but not "wasted" when they left the restaurant, and R.M. did not think C.F-L. "was too drunk to walk out of the restaurant." Although the surveillance footage from outside of Higdon's house and Higdon's roommate's testimony certainly established that C.F-L. fell down before and when entering Higdon's house, Higdon testified that he and C.F-L. slept for an hour and a half before engaging in sexual activity, that C.F-L. initiated some of the sexual contact, that C.F-L. actively participated, and that all contact was consensual. Higdon also testified that C.F-L. told him "no" when she did not want to engage in an activity and when she wanted him to stop, which was some evidence suggesting that C.F-L. appeared capable of distinguishing between the activities she wanted to engage in and those she did not. Higdon also said that he complied when C.F-L. said "no" or told him to stop.

¶ 35 C.F-L. did not recall, and thus did not testify to, many details of the encounter, but Higdon did. As a result, much of the case hinged on the jury's assessment of Higdon's credibility. And the prosecutor's repeated suggestions that Higdon would have shared

22

all the details with Detective Lopez if he were not guilty significantly undermined Higdon's credibility. *See Castro*, ¶ 44. Although the prosecutor's statements implying Higdon's guilt were not as egregious as those deemed to be plain error in *Ortega*, 597 P.2d at 1036, the effect was nonetheless the same — to improperly penalize Higdon for exercising his constitutionally guaranteed right to remain silent.

¶ 36 Finally, the prosecutor's questions were not fleeting. He extensively cross-examined Higdon about his failure to provide the details to Detective Lopez and brought the issue up again in closing argument.

¶ 37 We conclude that the prosecutor's questions and comments implying Higdon's guilt "prejudiced the most fundamental guarantee of our justice system, the right to a fair trial," *id.*, and cast serious doubt on the reliability of the judgment of conviction, *see Hagos*, ¶ 14. Thus, we conclude that the error was plain and requires reversal.

### III. Disposition

¶ 38 We reverse the judgment and remand the case for a new trial.

JUDGE FREYRE and JUDGE SCHUTZ concur.